Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 2296 | DATE | 9/5/2003 |
| CASE TITLE | Pamela Abbott vs. Village of Westmont | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [11-1] is granted. Judgment entered in favor of the defendant. All future dates, including trial date of 10/20/03, are stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 0 9 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | U.S. DISTRICT COURT | | |
| ✓ | Mail AO 450 form. | CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 9/5/2003 | |
| | | 03 SEP -8 PM 3:01 | date mailed notice | |
| MD | courtroom deputy's initials | FILED FOR DOCKETING | MD | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PAMELA ABBOTT, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> VILLAGE OF WESTMONT, ILLINOIS, ) <br> ) <br> Defendant. ) <br> ) | No. 02 C 2296 <br> Judge Joan H. Lefkow |

DOCKETED SEP 09 2003

## MEMORANDUM OPINION AND ORDER

In this action filed by plaintiff, Pamela Abbott ("Abbott"), alleging sexual harassment (Count I) and sex discrimination (Count II) under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000(e) *et seq.*, defendant, Village of Westmont, Illinois ("Westmont"), has moved under Rule 56, Fed. R. Civ. P., for summary judgment. The court has jurisdiction over the claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C § 2000e5-(f). For the reasons set forth below, the motion is granted.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving



party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF

Abbott is a female firefighter/paramedic who was employed by Public Safety Services, Inc. ("PSSI") from 1989 to 1992 and 1993 to May 18, 1995, when she resigned. (Def. L.R. 56.1 ¶¶ 1, 53.) Westmont is a municipal corporation existing under the laws of the State of Illinois and maintains a fire department. (Def. L.R. 56.1 ¶ 2.) PSSI is a company that contracts licensed paramedics to a large number of municipalities in the Chicago area. (Def. L.R. 56.1 ¶¶ 4-5.) PSSI contracted licensed paramedics to the Westmont Fire Department from 1992 through 1998. (Def. L.R. 56.1 ¶ 6.) From 1993 through December 1994 Abbott was exclusively employed by PSSI. (Def. L.R. 56.1 ¶ 8.) From January 1, 1995 through May 1, 1995, Westmont paid Abbott an hourly wage for additional hours worked in her position of EMS Coordinator, which supplemented her regular salary paid by PSSI. (Def. L.R. 56.1 ¶ 9.) After May 1, 1995 Abbott was once again paid exclusively by PSSI for her work. (*Id.*)

No employee of Westmont had the authority to terminate Abbott's employment relationship with PSSI, although Abbott maintains that Westmont had the authority to

2

recommend and request that PSSI terminate her employment relationship. (Pl. Resp. to Def. L.R. 56.1 ¶ 15.) Westmont did not maintain a personnel file for Abbott nor did it perform any written work performance evaluations for her. (Def. L.R. 56.1 ¶¶ 20-21.) When Abbott resigned from PSSI, she submitted her resignation to Gary Frederick ("Frederick"), the President of PSSI, and did not inform anyone at Westmont. (Def. L.R. 56.1 ¶¶ 17-18.) With the exception of the additional hours Abbott worked for Westmont from January 1, 1995 through May 1, 1995, PSSI paid all of Abbott's salary, pension, holiday pay, sick pay, state and federal taxes and all other benefits.[1] (Def. L.R. 56.1 ¶ 27.)

In November 1994 PSSI promoted Abbott to the position of EMS Coordinator, with the responsibilities of supervising the work of the other PSSI contract paramedics at Westmont. (Def. L.R. 56.1 ¶ 29.) Westmont has three fire stations located at three separate locations: Station #1, Station #2 and Station #3. (Def. L.R. 56.1 ¶ 30.) Abbott, while working for PSSI and assigned to Westmont, worked out of Station #1, where all the contract paramedics always worked while on shift. (Def. L.R. 56.1 ¶ 31.) Firefighters employed by Westmont were part-time firefighters who worked out of Station #2 or #3. (Def. L.R. 56.1 ¶ 32.) The contract paramedics employed through PSSI would have contact with the part-time firefighter employees of Westmont at fire class or at daily fire drills. (Def. L.R. 56.1 ¶ 33.)

Firefighter Al Chiappano was a part-time employee of Westmont during 1994 and 1995. (Def. L.R. 56.1 ¶ 34.) He was not one of Abbott's supervisors, but could serve in a supervisory position over Abbott at fire or automobile scenes. (Pl. Resp. to Def. L.R. 56.1 ¶ 38.) Abbott

---

[1] The parties dispute who paid any overtime Abbott incurred. The court does not view this dispute as material.

3

maintains that Chiappano used sexually derogatory names in reference to her, but she was never present when Chiappano used these terms.² (Def. L.R. 56.1 ¶ 41.) One co-worker told Abbott that he heard Chiappano call her a "cunt" at least once. (Pl. L.R. 56.1 ¶ 64.) On May 8, 1995, Abbott made a written report to Assistant Chief David Weiss of some sexually derogatory remarks made by Chiappano. (Def. L.R. 56.1 ¶ 48.) Abbott stated that she heard from another employee that Chiappano wanted to catch Abbott and a co-worker "in the act," thereby implying that Abbott was having a sexual relationship with the co-worker. On the same day, Chiappano allegedly ordered firefighter Larry Masa to "write up Pam." (Pl. Ex. 5.) On another occasion, Tim Saul, both a contract paramedic and a part-time Firefighter, referred to Abbott as "Queen Bee" and another paramedic as "Assistant Queen Bee." (*Id.*) Abbott also complained that Chiappano constantly intimidated her by sitting with his arms folded over his chest and glared at her. (*Id.*)

In addition to Chiappano, Abbott also complained that Lieutenant Steve Demas allegedly referred to her as "the tits" in late 1994. (Def. L.R. 56.1 ¶ 43.) Abbott also complains of Westmont's Fire Chief, Frank Trout ("Chief Trout"), who she maintains often commented about sexual matters and had a philosophy that women belonged at home barefoot and pregnant and not in the work force. (Pl. L.R. 56.1 ¶¶ 27, 32.) Abbott testified that on one occasion Chief Trout arrived late for a meeting and joked, "Sorry that I'm late, but I was at the hot tub[] fucking my wife, and that's why I'm late." (Pl. L.R. 56.1 ¶ 28.) Abbott also testified that Chief Trout had

---

²In both her response to Westmont's statement of material facts and her own additional statement of facts, Abbott never details what it was Chiappano said, when he said it or how often he said it. In her complaint and in response to Westmont's motion for summary judgment Abbott states that she was referred to regularly as "Big Tits," "Tits," "The Tits," "Cunt," and "Bitch." Abbott only details these incidents of alleged harassment, however, in an exhibit, with no foundation provided, attached to her response in opposition to summary judgment, which the court only considers because it will afford leeway to Abbott.

4

conversations where he stated his belief that women were taking jobs that should go to men and that women should stay home cooking and taking care of the family and children.[3] (Pl. L.R. 56.1 ¶ 29.)

On May 18, 1995, Chief Trout wrote a memo to Abbott asking for the names of any individuals that may have information regarding her May 8 written report about Chiappano and the sexual comments he made behind Abbott's back. (Def. L.R. 56.1 ¶ 51.) Abbott apparently never received this memo. (Pl. Resp. to Def. L.R. 56.1 ¶ 51.) In any event, on the same day Trout's memo was written Abbott resigned from her employment with PSSI. (Def. L.R. 56.1 ¶ 16.)

## DISCUSSION

Abbott brings sexual harassment and sex discrimination claims against Westmont. With respect to both claims, Westmont argues that Abbott's action fails because she was an independent contractor who cannot recover under Title VII and because no "indirect" employment relationship can be found. Assuming either an employer/employee or an "indirect" employment relationship were found, however, Westmont argues that the sexual harassment claim should be dismissed because (1) Abbott was not constructively discharged; (2) there was no hostile work environment; (3) there was an adequate response by Westmont to any alleged harassment; and (4) Abbott declined a transfer from PSSI to another contract municipality. Westmont argues that the sex discrimination claim fails as a matter of law because there is insufficient evidence for Abbott to meet her *prima facie* case or to establish that Westmont's

---

[3] Abbott also complains of inappropriate behavior by Chief Trout toward Frederick's wife. Abbott does not explain how this evidence is relevant here.

5

legitimate and nondiscriminatory reasons for its actions were a pretext for discrimination. Because the court concludes that Abbott was neither a direct or indirect employee of Westmont, the court does not address the merits of the sexual harassment and sex discrimination claims.

Starting with the issue of direct employment, Westmont moves for summary judgment on grounds that Abbott was an independent contractor employed by PSSI and, therefore, because no employment relationship existed, she was not an employee of Westmont for Title VII purposes. Under established Seventh Circuit precedent it is clear that an independent contractor is not protected under Title VII. *E.g., Worth v. Tyer II*, 276 F.3d 249, 262 (7th Cir. 2001); *EEOC v. North Knox Sch. Corp.*, 154 F.3d 744, 747 (7th Cir. 1998); *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 492 (7th Cir. 1996); *Ost v. West Suburban Travelers Limousine*, 88 F.3d 435, 440 (7th Cir. 1996); *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991). The issue of whether an individual is an employee or independent contractor under Title VII is a legal conclusion for the court to determine by applying a five factor test:

> (1) [T]he extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of the skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Worth*, 276 F.3d at 263, quoting *Knight*, 950 F.2d at 378-79; *North Knox Sch. Corp.*, 154 F.3d at 747. The most important factor is the employer's right to control the worker's actions. *Id.*, citing *Knight*, 950 F.2d at 378. "If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result

is achieved, an employer/employee relationship is likely to exist." *Worth,* 276 F.3d at 263, citing *Spirides* v. *Reinhardt,* 613 F.2d 826, 831-32 (D.C. Cir. 1979).

*1.     Employer Control*

The relevant inquiry here is the type of control that is exerted, as "freedom of contract permits contracting parties to 'control' each other by detailing obligations in their agreement." *Kerr* v. *WGN Cont'l Broad. Co.,* No. 01 C 7196, 2002 WL 1477629, at *4 (N.D. Ill. July 9, 2002), citing *Hojnacki* v. *Klein-Acosta,* 285 F.3d 544, 551 (7th Cir. 2002) ("one can 'control' the conduct of another contracting party by setting out in detail his obligations; this is nothing more than the freedom of contract."). Such contractual control is "different in kind from the type of discretionary daily control that employers routinely exert over employees." *Id.,* citing *Hojnacki,* 285 F.3d at 551; *see also, North Knox Sch. Corp.,* 154 F.3d at 748.

Abbott has the burden of proof on this issue, *see Ost,* 88 F.3d at 438, and she has not submitted detailed factual evidence showing the degree of control and supervision Westmont maintained over her work. She states that she was under the direct control and supervision of the Westmont Fire Department, specifically Assistant Chief Weiss, because (1) Westmont had the right to control and direct her work, (2) Westmont could have recommended her termination to PSSI, (3) Chief Trout had control over the functions and the duties of the department and (4) the highest ranking member of Westmont's Fire Department was in charge of any particular scene and Abbott would be under this individual's supervision and control. Westmont responds that the contract entered into between PSSI and Westmont provided that the supervision, control and direction, including the power of discipline of the PSSI paramedics, rested with PSSI.

7

Based on the court's review of the facts as presented by the parties, this factor weighs against a possible employer/employee relationship. The ultimate decision to terminate and/or transfer an employee stayed with PSSI. Abbott's argument that Westmont could "recommend" termination implicitly proves Westmont's point, as if Westmont can recommend changes to PSSI it is not the ultimate decisionmaker and does not control the employment relationship. Moreover, a review of the evidence Abbott cites to shows nothing more than if a municipality complained of a certain paramedic, PSSI would strongly consider removing that paramedic from that municipality. (Frederick dep. at 115-16.) This evidence does not support the notion, as Abbott suggests, that the employee's employment relationship with PSSI would be terminated based on any such recommendation.

In addition, other evidence supports Westmont's argument that no employer/employee relationship existed. In this respect, the language of the contract between Westmont and PSSI provides pertinent insight. While Abbott argues that Westmont and Chief Trout had the right to control and direct her work, this power was granted by contract and gave Westmont's fire chief, or his designee, the ability to assign to PSSI paramedics "any and all lawful duties, responsibilities and assignments." (Def. Ex.4.) This is more an example of the parties' freedom of contract rather than the discretionary daily control an employer can expect to exert over an employee. *E.g., North Knox Sch. Corp.*, 154 F.3d at 748; *see also, Mazzei v. Rock-N-Around Trucking Inc.*, 246 F.3d 956, 964 (7th Cir. 2001) ("Although Mazzei accurately describes RNA's ability to instruct owner-drivers who accept an assignment from RNA, the control RNA exercises over its owners-drivers amounts to little more than the basic level of supervision required to ensure that the arrangement between RNA and its owners-drivers is of some value to RNA.").

8

The contract also provided that "other supervision, control and direction, including but not limited to the power of discipline, shall be the responsibility of PSSI." (*Id.*) This further illustrates that the daily control an employer is able to exert over an employee was within the power of PSSI and not Westmont.

Finally, other facts in the record point to the same conclusion, including that PSSI decided which municipality to assign a particular employee to (Def. L.R. 56.1 ¶ 5), no personnel file or written work evaluation was ever performed for Abbott by anyone at Westmont (Def. L.R. 56.1 ¶ 21), and PSSI supplied replacement paramedics if a PSSI paramedic was absent from duty. (Def. L.R. 56.1 ¶ 25.) Accordingly, all of the above leads the court to weigh this factor against an employer/employee relationship.

*2. Necessary Skills*

"An individual's unique work skills may indicate independent contractor status," *Worth*, 276 F.3d at 263, while skills which are more mundane or that the entity provided training for would be more reflective of an employment relationship. *Kerr*, 2002 WL 1477639, at *5. In this case it was PSSI's responsibility to insure that each paramedic assigned to Westmont was licensed as a paramedic by the State of Illinois and was certified as a Firefighter II pursuant to the guidelines of the State of Illinois Fire Marshall. (Def. L.R. 56.1 ¶ 23.) Moreover, any paramedic hired by PSSI after the date of the contractual agreement with Westmont was required to be certified within six months of hire, at PSSI's expense. (*Id.*) Finally, ongoing training and continuing education of PSSI paramedics was at the expense of PSSI and was not to interfere with PSSI paramedics' work shifts at Westmont. (Def. L.R. 56.1 ¶ 26.) This factor weighs against an employer/employee relationship.

9

3. *Responsibility of costs of operation*

"When a person bears the costs of performing a job, such as purchasing tools of the trade, that person is more likely to be found to be an independent contractor." *Kerr*, 2002 WL 1477639, at *5. Abbott's ambulance and paramedic equipment were provided by Westmont. (Pl. Resp. to Def. L.R. 56.1 ¶ 11.) However, as previously noted, PSSI was responsible for the costs of training and licenses for its paramedics. (Def. L.R. 56.1 ¶ 23.) Thus, this factor would appear to be inconclusive.

4. *Income and benefits*

"[A] worker will be considered an employee of a company when the company pays the person a set wage, and treats the person as an employee for tax purposes." *Kerr*, 2002 WL 1477639, at *5. PSSI exclusively paid all of Abbott's salary with the exception of a period between January 1, 1995 through May 1, 1995, in which Abbott was paid an hourly wage by Westmont for hours worked in the position of EMS Coordinator. (Def. L.R. 56.1 ¶ 9.) This amount was in addition to her salary paid by PSSI. (*Id.*) Moreover, while paying her this hourly wage, Westmont issued Abbott an IRS 1099 form in the amount of $1,752.00. A 1099 form is a form "which would be appropriate for independent contractors." *North Knox Sch. Corp.*, 154 F.3d at 750. Abbott received no other benefit from Westmont and Westmont did not withhold any money from her paycheck. (Def. L.R. 56.1 ¶¶ 13-14.) PSSI paid all other salaries, pensions, holiday pay, sick pay and state and federal taxes. (Def. L.R. 56.1 ¶ 26.) Therefore, this factor weighs against Abbott being an employee of Westmont.

10

5. *Duration of employment*

Generally, an employment relationship is more likely when the parties have an expectation that their relationship will continue. *E.g., Hojnacki*, 285 F.3d at 550; *Kerr*, 2002 WL 1477629, at *6. The two contracts between PSSI and Westmont ran from May 1, 1992 through April 30, 1995 and May 1, 1995 through April 30, 1998. (Def. Ex. 3, 4.) Because the contract was set to expire and because there is no evidence of guaranteed renewals, *see North Knox Sch. Corp.*, 154 F.3d at 750, this factor suggests that no employer/employee relationship existed.

Weighing all of the above factors, the court concludes that Abbott did not have an employment relationship with Westmont. Only one of the five factors at least arguably supports Abbott, while four of the others cut against her view, including the most important factor of control. Thus, the court concludes that no direct employment relationship existed between Abbott and Westmont for Title VII purposes.

In the alternative, Abbott asserts that Westmont was her employer under an indirect or "*de facto*" theory. Such a *de facto* employment relationship exists when the employer "so far control[s] the plaintiff's employment relationship that it was appropriate to regard the defendant as the *de facto* or indirect employer of the plaintiff...." *EEOC v. State of Illinois*, 69 F.3d 167, 169 (7th Cir. 1995). The court in *State of Illinois*, in the context of examining whether the state was the "real" employer of teachers employed by local school districts, opined that the key powers are "naturally, those of hiring and firing." *Id.* at 171. The court concluded that these powers were in the hands of the local school districts, even if they were constrained by provisions of the state's school code. *Id.* Moreover, the court noted that "were the state pulling the strings in the background–telling the local school districts whom to hire and fire and how

11

much to pay them--a point would soon be reached at which the state was the *de facto* employer and the local school districts merely its agents. That point was not reached here." *Id.* at 171-72. *See also, Kerr*, 2002 WL 1477629, at *8 (concluding that no *de facto* or indirect theory was present, noting that the "only control [defendant] exerted over Kerr was the control authorized by the contract between [defendant] and [independent contractor].").

Abbott has not put forth enough facts to show that Westmont so far controlled the necessary aspects of her employment to establish that it was her *de facto* employer. While Abbott claims that she was under the direct control and supervision of Westmont, she presents nothing to suggest that this was anything other than the control authorized by the parties' contract. In addition, as the court discussed above, there is no evidence that Westmont had the power to hire or fire PSSI personnel. Abbott again argues that certain recommendations could be made to PSSI by Westmont, but even if the court were to indulge such an argument, Abbott has presented little evidence to actually show that Westmont "pulled the strings" on such employment decisions. Indeed, Abbott testified that when she resigned, she submitted her resignation to PSSI and never even notified Westmont. (Def. L.R. 56.1 ¶¶ 17-19.) These facts make it clear that no *de facto* employment relationship exists.[4]

---

[4]The court notes that Abbott does not argue, and the court need not address, any aider or abetter or "interference" theory of liability under Title VII. Hypothetically such a situation would take place when an "employee of employer X . . . bring[s] a Title VII action against employer Y when Y is not his employer, but merely someone whose discriminatory conduct interferes with his employment of employer X." *EEOC v. Foster Wheeler Constructors, Inc.*, No. 98 C 1601, 1999 WL 515524, at *5 (N.D. Ill. July 14, 1999). The Seventh Circuit has strongly implied, but not yet decided, that such a theory would not be allowed under federal antidiscrimination laws. *See State of Illinois*, 69 F.3d at 169 ("We think it very doubtful that laws which forbid employers to discriminate create a blanket liability to employees of other employers for interference with *their* employment relationships.") (emphasis in original). At least two cases in this court after *State of Illinois* have disagreed about whether such a theory exists. *Compare Wheeler*, 1999 WL 515524, at *10 (concluding that such an "interference" theory does exist) *with Kerr v. WGN Cont'l Broad. Co.*, 229 F. Supp. 2d 880, 887 (N.D. Ill. 2002) (holding that no "interference" theory is available under Title VII).

Because the court concludes that no direct or *de facto* employment relationship existed between Abbott and Westmont, her claims under Title VII must fail.

## CONCLUSION

For the reasons stated above, Westmont's motion for summary judgment is granted [#11]. The clerk is instructed to enter judgment in favor of the defendant. All future dates, including the October 20, 2003, trial date, are stricken. This case is termianted.

Enter: *[signature]*
JOAN HUMPHREY LEFKOW
United States District Judge

Date: September 5, 2003